Good morning, Your Honor. Shane Murphy on behalf of Plaintiffs and Appellants. If I can, I'd like to reserve five minutes for rebuttal. That's fine. Okay. So the core of this case is really what evidentiary burden does the plaintiff carry in a summary judgment context to prove the initial prima facie showing of a retaliation claim? Under the very, very well-established McDonnell-Douglas factors, the initial burden is on the plaintiff to show that there was a kind of prima facie case of retaliation. You have protected activity, an adverse employment action, and a causal connection between the two. And the reason McDonnell-Douglas exists is because it's well-recognized that there is an enormous social utility to having people come forward and disclose misconduct by other parties within a company that they're working for. Also, in the discrimination context, there's utility as well. And so, really, the idea is that because it's hard for employees, given their position and what happens to them as a result of their actions, to prove their cases, the McDonnell-Douglas burden relieves that, the McDonnell-Douglas analysis relieves that burden from the plaintiffs so that they can at least proceed to the jury and have the jury determine whether or not some kind of retaliation. Do you have to have some evidence of the protected activity, which includes a reasonable belief that there was something illegal going on? Yeah. Well, yes and no. Like a lot of the cases have said, the people who are in a position to report these things are not lawyers. So you maybe don't have to cite a specific statute, but it needs to be a reasonable belief that something illegal was going on? I think that that's a fair assessment of what the requirement is. It sounds like the way that the courts have developed this, that you can have a gut feeling that something's improper. But if you have a gut feeling that having white lights is illegal, is that something you could complain about and then have a retaliation claim based on? No, because it's not illegal to have white lights unless something happens in the next legislative session. But in this context, you can have a feeling that something's wrong. Okay. Let's talk specifics. The fee waivers. That might have been unfair, but I thought actually Rodriguez said, well, not really illegal, but it just didn't seem right. So why is that a protected activity? Well, to start with, they're not contending that this was not illegal, that it didn't violate a regulation. Their position is, at least my understanding was, that the plaintiff herself needed to have an understanding that what was going on was wrong, was actually legal, that there was some sort of statutory violation or regulatory violation. And there wasn't, right? There wasn't. With respect to the fee waivers? Yeah. What I want to do is go through each of these because I think each one of them is different. No, they are. And you can help us. So on the fee waiver, I agree with your characterization that, you know, the employee can't possibly be expected to cite chapter and verse of the CFR or the federal rule or anything like that. Right. But it has to be something that's improper or illegal. Okay. And that's true. You know, with respect to whether or not the fee waivers are illegal, there was an expert declaration that was submitted with the moving papers in which the expert opined about the relevant, applicable regulatory structure that would have made that illegal. It may be that that specific instance wasn't illegal. Okay. Well, let's go to the nursing homes. Okay. And the other thing that you probably were going to get to is that if you get through all of these things, you still need and has to have gone to someone or come to the attention of someone in the decision-making authority with respect to the termination or adverse action. Right. Because the district court did conclude that there were tribal issues with respect to protected activity. Or assumed. I think the district court assumed that and then moved on and said, but there was no knowledge by the decision-makers. Right. Well, there was precatory language that she was going to assume that, but then she actually conducted an analysis. She talked about what was being reported by the plaintiffs and came to the conclusion that you don't need to have an encyclopedic knowledge of the law and that there are, in fact, I believe her phrase is that there are tribal issues of fact that protected activity was engaged in by the plaintiffs. The court assumes without deciding that plaintiffs have each raised a genuine issue of material fact as to the first element of their retaliation. Right. And then a paragraph later, she actually decides it. I think she just says something about how they don't need to be able to cite the statutes, which is what we said. She says there's something about the banking, the issues that the plaintiffs were identifying as problematic don't easily align with a legal conclusion of unlawfulness, but that there, in her mind, that there were tribal issues of fact with respect to the protected activity that they were engaged in. Why did she rule against you below? Because of causation. She felt, her understanding was that there wasn't, that that conduct that they were complaining about hadn't been communicated to the parties who ultimately made the hiring and firing decision with respect to them. Do you disagree? That's why I'm here. And that's why I'm going through each of these. So let's go back to the nursing homes. Okay. With respect to Sangalaji, Sangalaji. Sangalaji, yeah. Right. There was information sent to Sagasta, but what is the evidence with respect to Sangalaji? Well, so the nursing home was actually something that Rodriguez first noticed, and she was... So what's the evidence? Tell me where I look in the record. I know she's the one that reported it initially. So she had a conversation. She, I believe, sent an email to Wilmoth explaining concerns that she had with respect to the practices of the account being held by the nursing home or being managed by the nursing home. And that email, there's sort of a back and forth that goes on. At some point, that email is sent to Sangalaji because Sangalaji is Rodriguez's direct supervisor. He then forwards it to Wilmoth and to Moore, I believe, and then, or sorry, to Hall and Moore. And then Moore then sends an email to Wilmoth notifying her a second time that there's something amiss with the nursing home. So I was trying to parse this, and it seems that you have two clients. You have Rodriguez. This is Rodriguez's main claim, I think, this nursing home issue. Yeah. And I was trying to figure out whether in Rodriguez's summary judgment papers she ever pointed to any evidence that Hall knew about this. Because the only evidence I could find that Hall knew about it came in, I don't know how to say it, Mr. Sangalaji's papers. So either Rodriguez missed it, or maybe you can point me to something where Rodriguez incorporated Sangalaji's papers, but I wasn't sure that Rodriguez had actually put forth any evidence in her papers that Hall knew about this. Okay. At this point, I couldn't tell you. I could prepare something for you. See, that's the problem with the briefing. There's a lot of this and not a lot of detail. So first of all, those stipulated facts, if you didn't point the district court to them, I don't know how the district court is supposed to sort through each of those if you don't say this is undisputed or at least it wasn't answered. And I don't think we should have to do that. So that's really your obligation in briefing and at argument. You've got two clients and about seven or eight claims. Well, let me take a step back, because there's actually multiple bases for drawing an inference that there's a causal link between the protected activity and the ultimate firing that occurred. The first one that we've been talking about now is this direct communication. Like, did they actually, is there evidence that there was an actual direct communication between one of the three, specifically Hall and Wilmoth, decision makers and the plaintiffs? So if we set that aside, there's actually three other grounds that we can look to to see causation. The first one is the discharge sheet that was prepared, that spreadsheet that was prepared. That goes to pretext, though. That doesn't help you get to whether the decision makers knew about this protected activity. Well, hear me out, because I believe that it does. I mean, I believe this is briefed in the papers in this way. So the idea is that you have a spreadsheet that for whatever reason has the plaintiff's names on it. At the time that the spreadsheet is initially generated, bear with me and I'll get there. At the time that the spreadsheet is initially generated, both plaintiffs had only been working there. Let's give you that it was, that what they said on the spreadsheet was false. How do we know they didn't just write a false thing because they didn't like these people? Okay, so the inference that can be drawn from this stems from the fact that Hall testified that she talked to Moore and Sagasta, the two direct supervisors. And as the court, the district court points out in its moving, or in its order, there's no dispute that those two knew that plaintiffs were engaged in protected activity. So Hall goes and has a conversation with Sagasta and Moore and says, hey, who do you think that we should include on a hiring and, or on a firing and discharge risk, a reduction of force list? And Moore and Sagasta supply that information. That's what Hall testifies to. She says, I can't remember, but if I were to, if I were to include them, I would have talked to their direct supervisors, Moore and Sagasta. So what you have is a situation where Moore and Sagasta are influencing the. At least depose these people and ask them, like, did you talk about these specific employees? I mean, it was very general. Yes, I consulted them about who should be on the list, but I mean, I didn't even think that testimony was we talked about every single employee individually. I mean, don't you need more evidence than just there was some conversation sometime about who should be on the list? From a standpoint of putting on the elements of a McDonnell Douglas analysis at a summary judgment stage, I think there's a basis for an inference to be drawn that there's a causal connection between the two. That because they had, because she could have had a conversation or did have a conversation. Could have or would have or did have. I mean, that is easy to determine by taking a deposition and they would say yes or no or confirm. That may be. I mean, I apologize. Yeah, we're just sort of stuck in this situation where lots of things might have happened. But we don't know. And so much of the argument seemed at the district court to be based on this. Well, most likely, because if this person is in this relation to that person, you can infer that they must have had this communication back and forth with each other. So now you're saying, well, there's direct evidence. Well, so you have. That's kind of shifting gears from what the district court was focused on. But it's based on the evidence that was in front of the district court. And so I. Do you, let me start with this. There's kind of a long list of facts, disputed, undisputed, et cetera. In your view, do you have an obligation as a moving party to point in light of the massive record to point the district court to the disputed or undisputed facts that would fit into your theory? Yes. And the district court actually recited most of those facts in its decision. I mean, the district court acknowledged that Sengledeshi testified that he had talked to Hull and conveyed this information to her. She has a footnote in her order where she concedes as much, but she's. So I think that's true as to, as I can trace all of this to the specific testimony, that is true as to the security concerns about the bank. But then we have a question of whether those concerns were reasonable, whether there's any reason to think there was anything illegal about not having a camera in the vault. And I can't find anything that tells us that was a reasonable concern about illegality. Be that as it may, there was also testimony cited, or at least there was evidence cited by the court, about the role of Moore and Segosta in connection with making the spreadsheet. There's also testimony that's cited by the court in its order about Segosta and Moore playing a role in moving this, the reprimand letter through Segosta with respect to Rodriguez. And that's the third basis. There's actually a fourth basis, which is a temporal one, all of which show a causal connection. And I want to take a step back really quickly here, because I see the concern that the court has with respect to how trial counsel presented this to the district court and the way that the evidence was marshaled. But these — But also how it's presented to us. I mean, in our, in the briefing here, there are all these general statements about plaintiffs generally, and then we have to figure out, well, okay, which one? These are two people with two motions, and much of your, many of your citations did not actually have support when you read the testimony that you were citing. So we've had a real struggle to try to figure out what is the factual basis for these claims. Well, I think if we look at the court's order, there's sufficient evidence in the order itself identified by the court to find that there's a basis for inferring causation. The fact that the court cites, too, the discharge, the reduction of force spreadsheet, and that more in Segosta played a role in that, that more in Segosta played a role in issuing a reprimand letter to Rodriguez, and that there was — and I don't have the order in front of me, but there was some other evidence with respect to Rodriguez reporting stuff to Hall that — Let me ask you, with respect to the written warnings in the files of employees, were there other employees besides Rodriguez that got terminated with that as a basis? I can't answer that question definitively. I do know that there's testimony that if somebody had a reprimand letter in their file, that those people were automatically put on the list. That's my recollection. So that would help if we knew the evidence, because let's say there are other people who had that written reprimand order, but they didn't get terminated, but she did, then that would seem to me to potentially raise this inference that you're talking about, that she got singled out. But I couldn't figure out if any other employees ended up the same as her or different than her. Right. My understanding is — Is there anything, can you point me in the record, where it's answered? At this moment, I can't. I could go back to my brief and submit a letter to the court trying to identify supporting evidence in this fact. I mean, my understanding is the record contains evidence that employees who are similarly situated with Rodriguez and Zingaledashi who had not been there long enough to have evaluatable materials were not included on the list. And so these are people that didn't have a reprimand letter issued to them, but also had not been there long enough to have some sort of the criteria for evaluating their performance in front of the panel as well. And those people were not included on the list initially. But you don't have any evidence of people who were either included on the list or later terminated, but who also had a warning letter in their file. That I don't know. I can't answer at this point. Thank you. Go ahead. Am I right that the two plaintiffs did not incorporate each other's pleadings by reference somewhere that I missed in the record here? I can't answer that question at this point. I'm not sure. All right. I apologize. Thank you. Okay. Thank you. Thank you, Your Honor. May it please the Court, Troy Boer on behalf of the appellees, to answer the question that you just asked, Your Honor. Page 6 of our brief, which refers to page 1694 of the record, no bank manager or assistant branch manager who had a written warning or final warning on file was retained by the bank. So there were none. I don't know how many. That isn't the record's pretty sparse on those sort of things. But it does rather emphatically say that no one who had a reprimand in the file was retained by the bank. So there's no disparate treatment there. So then you have the situation with someone receiving the lowest warning or the lowest criteria. And I guess the person with the lowest criteria means there's just one of those, right? One lowest. There's only one person who's lower than lowest. But the question then is, well, if that's a criteria that was created after the so-called not-a-fit criteria, does that raise some inference that that criteria was targeted at Sangiology? At Rodriguez? No, Sangiology, because I thought Rodriguez got the warning. Yes, and was terminated for that reason. But the lowest score person. Well, Your Honor, if there were evidence that the decision-makers had knowledge of protected activity, and this weren't criteria that were being put together to let 40 employees go, and that somehow they manipulated the criteria that lets 40 employees go just to get at this one, because he didn't happen to have a written reprimand in his file, if that could be believed, then possibly. But I think it's really worth drilling down here on what was argued below and why. And it wasn't an oversight that these direct links were not raised in the district court. Well, we know that Sangiology complained about the bank security and Hall knew about those complaints. The placement of security cameras, yes. Absolutely. So is your response to that that that wasn't illegal and it's not reasonable to think it was illegal? My response to that is the response to a number of the ways that these were litigated, and they all fit into the same legal box, in my view. So the reason that there was a focus by the plaintiffs on the complaints to the supervisors rather than the decision-makers below was because those communications actually have enough content that you could arguably say that the supervisors were receiving information that a reasonable person would think was illegal. Once you peel off the communications just with the supervisors and now we're just talking about communications with the decision-makers, here's how it looks. An e-mail or a conversation that says, by the way, I think that the security cameras aren't located in the right spot. Okay, we'll send someone to take care of that, and they do. Once we're peeling off the supervisors and it's just these few little threads that only come up on appeal of what the decision-makers knew, there's not even a plausible argument that it could have reasonably been understood to be protected activity. And because it wasn't reasonable to think it was illegal, I haven't understood your answer. Well, number one, it wasn't reasonable to think it was illegal. Number two, it wasn't reasonable to think that it was being reported as illegal. It was just a concern about where the placement of the cameras were, and that was never brought to the attention of the district court. And I think it's worth reviewing the district court transcript because the district court comes out and says, here's the way I understand the briefing. Your argument is that Moore spoke with Hall, and therefore, there's a causal link there. The district court, though, pointed out the problem with that, which is why there was a pivot in the hearing and now a pivot on appeal. Record 21. Moore didn't, quote, didn't know anything about the reduction in force until September. So if he didn't know there was going to be a reduction in force, and the district court comes out and says, you've conceded this, right, on the transcript, plaintiff's counsel doesn't get up and say, oh, no, we didn't. Moore didn't know until September, also 193 through 96 of the record. Moore didn't know until September. He couldn't have been arguing or sending information to make sure that these two get fired if he doesn't know he's being asked for the purpose of getting them fired. So what's the pivot in the hearing? The pivot in the hearing is, well, now he may not understand that, but he just doesn't like them because of it, so he's giving poor verbal reports and it feeds into something he doesn't know what's going on. The district court rejects this. So now we come up on appeal. During that hearing and in the papers, it is never pointed out that you can get a causal connection because of any kind of direct communications, and there's a good reason for that. Because if you look at the direct communications with the decision makers and what they actually knew, it is so sparse that you can't possibly get notice of protected activity as opposed to just general employee complaining. Also, it doesn't make any sense because at that point, you're not talking to the person in charge of the L.A. branch. You're talking to someone else about, hey, I think our security cameras need to be in a different spot. Okay, we'll send someone else. But, so, doesn't that depend on the content of what is said? So, I mean, if someone says, I'm trying to think of what would clearly be illegal at a bank. But, I mean, if someone says, you know, my complaint is that people are putting money in their pockets and leaving the bank, you know, all the employers are stealing money from the bank. Of course. Then, isn't it, I mean, just on the face of it, that would be a complaint about some kind of illegal activity, right? So, I don't know that the fact that it's just a statement to a high-up supervisor itself is a response. It has to be about, like, whether you would reasonably assume from what was said that it was illegal. Absolutely. And so, 706. So, I think we're kind of back to, like, how do we know that a concern about where these cameras were in the bank wasn't a reasonable legal concern? Well, you have to look at what the evidence of what Hall knew and decide whether that puts her on notice that these are complaints about protective activity in such a way that a jury could make a reasonable inference that that report about security camera placement led her to manipulate the matrix to fire 40 different employees and to rig it so that this person would be included in the firings. A jury has to conclude that. I mean, you look at 706 of the record. But a jury just has to conclude that they included him because of this. That's right. That's right. They include that the matrix, there's no argument here that the criteria weren't applied. The argument is that there was a manipulation of the criteria so that it would ensnare him. At page 706 of the record is the entirety. Did he ever come to you with complaints about the auto body shop? No. Did he ever come to you with complaints about security equipment, meaning the branch didn't have the right cameras? That I don't know if I heard from him. But I know that our security officer, he heard from him about these concerns. Okay. And that potentially we didn't have cameras in the vault, maybe. Okay. And that was addressed by security? Yes. End of discussion. That is not a report of protected activity. I would urge the court to look also at the e-mail that is cited over and over again in the briefs from Ms. Rodriguez. It's at 96 and 97 of the record, talking about whistleblowing and things of that. If you look at that e-mail, that e-mail is she's defending herself for getting reprimanded for using her cell phone during a meeting. It doesn't have anything to do with reporting protected activity. So what the district court is told, the district court is told that the only way that we can make this link is from discussions between Hall and Moore. And the district court says, well, that's not going to help Rodriguez  He wasn't even her supervisor in that way. What else is the problem that trial counsel knows, which is why it's argued the way it's argued down below, 114 and 270 of the record? Mr. Sangalaji says, quote, I did not elevate any of my complaints to management above Ms. Sagasta and Mr. Moore, end quote. That's from his own declaration. And so there's a perfectly good reason why trial counsel focuses on the link between Moore and Hall to be able to get the causal inference. And the reason for that is the only complaints that could even plausibly put somebody on notice that there's protected activity go to the supervisors, not the decision makers. And so they need that link. They have statements like this from one plaintiff saying, I never raised my complaints above it. Rodriguez has a problem because her supervisor is not Moore, and he's the one that supposedly had these conversations with Hall. And the other really big problem that the district court pointed out was that Moore didn't know that there were going to be layoffs until September. And so that's why there's a pivot on appeal and all of this evidence that, yes, it's somewhere in the voluminous record, agreed. It is somewhere in the voluminous summary judgment record. But there are specific sections in brief after brief after brief. The facts are broken down this way and the arguments are broken down this way. Now we're going to talk about causation. Now we're going to talk about causation. What's your evidence about causation? What's your argument as to causation? In those sections, none of this evidence appears. And there's a reason for it. Let me ask about one specific thing. If we take this testimony at 703 to 709-ish that you've referred to, there is one area with respect to the nursing homes that's referenced in there, and that is a complaint from Rodriguez that, as I understand it, Hall became aware of, according to 709, although not sure how it came up, whether it was through Wilmoth or whatever. So then the question is, do you agree that there is some evidence of notice to Hall on this nursing home issue, and then what's the legal import of that? I believe that there was notice of, generically put, the nursing home issue because there's certainly an email that hit her inbox. But the question is, just like with the security cameras, how was it conveyed? And if you look at 709 of the record, which is Hall's page 117 of Hall's deposition, here's the entirety of it. I didn't know about that complaint, but my understanding is that the complaint came to Cindy Wilmoth via Jackie Rodriguez. And when you say it was a complaint, what do you mean? It was an email, I believe. There was an email about those accounts lacking documentation. I believe so. Okay, did it bother you that she raised an issue about how a customer had opened an account for these residents? No. I think that if I'm recalling correctly, that was when the issue or that concern was raised that Wilmoth involved our compliance or audit person. I can't remember her title. She looked into it. It was taken seriously and looked into. That's a normal email. That's what supervisors are supposed to do is to alert. But how does that tell us? I mean, if the content of that was, I think people are opening accounts and stealing money from these nursing home residents, if that's the gist of the concern, then why did what you just read not show that Hall knew that Rodriguez had complained about a concern about illegal activity? Your Honor, if that's the gist of that concern, if being told that there is a lack of documentation within an open account, if the gist of that when somebody conveys it is fraud. The problem is that these depositions never got into any specifics. I agree. I mean, so why isn't there? So she says her concern was that the residents were being defrauded. Then there's this vague testimony that Hall knew about the concern. Why isn't that enough to have, when inferences are taken in the plaintiff's favor, some dispute about whether Hall knew about a real legal concern here? Well, if she did, then it's with regard to Rodriguez, first of all. Right. So that's the question. I was narrowing it to Rodriguez. It's always to Rodriguez. Number two, if you look at Rodriguez's summary judgment papers, it never appears. Yeah, so this is my concern. It was never presented to the district court. That's my concern because we went and dug that out. And then, even once you get there, Rodriguez isn't the one with a matrix that is allegedly being manipulated to make sure that she's gone. Rodriguez is someone who, like everybody similarly situated, is gone because she has a written reprimand. But she didn't have the written reprimand at the time she was put on the list. Your Honor, as the judge pointed out in the transcript, he's very clear about this, because there's a shift during that hearing as well to talk about the reprimand that came in August and other e-mails that were sent in August. And the judge says, you just told me that the decision-makers had already decided that these two weren't going to be retained in June. So how in the world does anything that happens after that, with regard to Moore, not the decision-makers, with regard to Moore and Sagast, how does any of that have anything to do with the causal relationship here? No explanation. But, okay, we just had a moment earlier where we just talked about Hall knowing about the concern about the nursing home. That gives you a causal relationship, right? There's time, there's knowledge, proximity in time and knowledge. So now separately talking about pretext, I don't understand how it's not pretextual to blame it on something that hasn't happened yet. Your Honor, you have to keep the actors distinct. If Hall is the one that put the reprimand in Rodriguez's file, I agree. If Hall is the one that tells somebody to do it, I agree. But, okay, say Hall puts her on the list in June, and now the company's explanation for why she was put on the list in June is that she got a reprimand in August? How does that make any sense? That doesn't make any sense. Okay, so what is the explanation for how she got on the list in June? We don't necessarily agree with plaintiff's theory. It just is plaintiff's theory. No, no, but what is your theory? What is the defendant's explanation for why she was put on the list in June? There is, in looking at this record, what happens is people are tasked with putting together their list to get rid of 40 employees, not two, putting together 40 employees, figuring out who's going to fit when the bank eliminates two positions and turns it into one, and they're going to refocus on commercial lending. Who is best equipped to fill those positions, and we're going to have to get rid of 40 people? The people tasked with that and putting together that matrix and seeing who's going to stay and who's going to go, three years later, didn't remember why a preliminary list three months earlier was written the way that it was written. And the record reflects only that, and the explanation is we don't know. I thought your explanation that you offered was she got this reprimand in August. Well, in September, that's the explanation, because in September, you actually have the finalized criteria. Our position is not that they were absolutely going to be fired as of June. That is the plaintiff's position that was internally inconsistent as pointed out by the judge. Well, because some people on the list weren't, in fact, fired, correct? That's my understanding. At least that's what the record says. Nobody could point to who or how or come up with a name, but that was the district court asked plaintiff's counsel that, too. And he said, I don't know, because he didn't get it out in discovery. That came up at the hearing as well. It's not our theory, Your Honor. It's theirs that's internally inconsistent, according to the judge. So do you have evidence that there were people on the list in June who weren't fired in September? No. No one has evidence one way or the other about that? Nope. They didn't get any of that in discovery. And let's think about it. I mean, the thing that plaintiff's counsel kept saying at the hearing. But isn't that something you should tell us? I mean, why isn't that part of the defendant's explanation? Because if the list is made in June and they're fired in September and there's no evidence that the list didn't just stay the same, then this whole August reprimand thing is very suspect. My understanding from the record is that it didn't stay the same, but nobody has a document that says, here's the people that were on it here. And what is the evidence in the record that it didn't stay the same? The fact that they kept working on it and came up with different criteria along the way. That is the only thing that's there, is that they didn't make the decision then and they kept working on it. And you don't keep working on it. It may be that it had a happenstance, the exact same people stayed on it. I don't know the answer to that. And neither did counsel at the hearing. And I just want to point out very quickly that the fact that these aren't protected activity reports explains why you don't have a whole bunch of e-mails about them. Plaintiff's counsel at the hearing below wanted to make a big deal about the absence of evidence gives rise to this inference. Well, it gives rise to the inference if what you have is I'm making a complaint at the EEOC, and then it's going up the food chain, and you have something like that, and then all of a sudden in discovery a year later the company says we have nothing. We never discussed this. We didn't care about it. That's absurd. But the fact that you got an e-mail that a security camera should be in a different place and there's not something linking it to how a matrix was put together to get rid of 40 people, that's not an inference. That is a completely understandable way to run a business. And they didn't know that this was going to turn into litigation when they were putting together this matrix, when they were deciding which 40 people, not two, were going to be fired. And so this record makes perfect sense. Thank you. Thank you, Your Honor. Would you give back a minute, please? Although you exceeded your time, we'll give you a minute, Mr. Murphy. Thank you. I think what the court is asking is really probative of why the burden shift analysis exists the way that it does. And I acknowledge that there are problems with the record that was put together in front of the district court. But they control the evidence, and they control the information with respect to hiring and firing decisions. They're trying, and through counsel's argument, he's sort of having his cake and eating it, too. He's saying, hey, Rodriguez was included on the list in June, and she was going to be fired. But, by the way, we didn't come up with selection criteria until sometime around September. And so we didn't necessarily fire her for the reasons that we originally put her on the list, which begs the question, why was she on the list? Why was she on the list in the first place? And there's no answer. There's no answer because they control the information, and our position as the employee is to create just enough of an inference to get past the prima facie showing. We're not saying necessarily that the jury will agree with us, but what we're saying is, is there enough to get to the burden shift so that they're in the position to have to show this was a non-protectional reason? Do you have any case that tells us we should look at Rodriguez's co-plaintiff's papers to figure out whether the evidence was presented to the district court to support her motion? I don't. I know that the district court sort of treated the body of evidence in its order with respect to both plaintiffs, and I apologize to the court that I can't cite to whether or not the respective parties incorporated their briefings and materials. But with respect to how the court analyzed it and the information that was in front of the court at the time, the court was looking at this information and made these determinations. So I can try and find something for the court if the court is interested in a letter brief. Otherwise. Thank you. Thank you. Thank both counsel for the argument this morning. The case just argued is submitted.
judges: McKeown, Friedland, Collins